# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303



David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 20, 2017

Steven M. Larimore
U.S. District Court
400 N MIAMI AVE
MIAMI, FL 33128-1810

Appeal Number: 16-10348-AA
Case Style: USA v. Claude Thelemaque
District Court Docket No: 1:14-cr-20503-KMW-1

A copy of this letter, and the judgment form if noted above, but not a copy of the court's decision, is also being forwarded to counsel and pro se parties. A copy of the court's decision was previously forwarded to counsel and pro se parties on the date it was issued.

The enclosed copy of the judgment is hereby issued as mandate of the court. The court's opinion was previously provided on the date of issuance.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Lois Tunstall
Phone #: (404) 335-6191

Enclosure(s)

MDT-1 Letter Issuing Mandate

UNITED STATES COURT OF APPEALS
For the Eleventh Circuit

_____

No. 16-10348
_____

District Court Docket No.
1:14-cr-20503-KMW-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

CLAUDE THELEMAQUE,
a.k.a. Teleco,

Defendant - Appellant.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

JUDGMENT

It is hereby ordered, adjudged, and decreed that the opinion issued on this date in this appeal is entered as the judgment of this Court.

Entered: June 20, 2017
For the Court: DAVID J. SMITH, Clerk of Court
By: Djuanna Clark

**ISSUED AS MANDATE 07/20/2017**

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-10348
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-20503-KMW-1

UNITED STATES OF AMERICA,

                                                                                       Plaintiff - Appellee,

versus

CLAUDE THELEMAQUE,
a.k.a. Teleco,

                                                                          Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 20, 2017)

Before TJOFLAT, WILLIAM PRYOR, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Defendant Claude Thelemaque ("Defendant") appeals his conviction under 21 U.S.C. §§ 959(a)(2) and 963 for conspiring to distribute a controlled substance knowing that it will be unlawfully imported into the United States. Concluding that sufficient evidence supports the jury's finding that Defendant knew the cocaine he helped to import to Haiti was to be imported into the United States, we affirm Defendant's conviction.

## I. BACKGROUND

### A. Factual Background[1]

Between 2005 and 2012, Defendant was a major participant in a drug importation ring that imported cocaine from Columbia, transported the drugs through Haiti, then sent the drugs to the United States to be sold. A corrupt commissioner and senior officer with the Haitian National Police, Defendant was able to protect the drug ring from detection by law enforcement.

A Colombian named Carlos Acevedo-Rincon helped to transport, via airplane, cocaine from Colombia and Venezuela to Haiti. It was Acevedo-Rincon's understanding that these drugs were subsequently transported to the United States from Haiti. Acevedo-Rincon often worked with Haitian national Rodolfe Jaar, who coordinated logistics on the ground in Haiti, including securing

---

[1] The jury having convicted Defendant, we draw all reasonable inferences and credibility choices in the Government's favor. *See United States v. Calhoon*, 97 F.3d 518, 523 (11th Cir. 1996).

aid from the Haitian police. When the delivery required the plane to land (as opposed to conducting an air drop), the police secured the airstrip and provided security and assistance in unloading the cocaine from the plane.

Known among some members of the conspiracy as "Teleco," Defendant was one of the police officers who worked with Acevedo-Rincon and Jaar. As the commander of the City of Leogane, Defendant had the entire town under his control, with about 60 officers under his supervision. Between 2005 and 2012, the conspirators brought twenty to thirty plane-loads of cocaine into Haiti, with each load bringing between 420 and 450 kilograms of cocaine.

In 2011, Acevedo-Rincon, Jaar, Defendant, and others met in the Dominican Republic to plan an air drop of about 450 kilograms of cocaine in Haiti. Acevedo-Rincon arranged for two other Colombians, Jairo Jaimes-Penuela and Francisco Anchico-Candelo, to be his representatives in Haiti and accept the shipment on his behalf. After this meeting, Defendant drove Jaimes-Penuela and Anchico-Candelo to a house in Haiti, where they awaited the delivery, along with Acevedo-Rincon's brother. Defendant owned the house, and the three guests made rental payments between $2000 and $2500 per month to Defendant, who visited the house several times. Defendant also provided the occupants with cash and cards in U.S. currency during their stay. The planned air drop, however, was delayed and ultimately cancelled.

Acevedo-Rincon, Jaar, and Defendant planned another operation for February 2012. This operation involved unloading a delivery of 420 kilograms of cocaine from the aircraft after it had landed on a remote airstrip. While this delivery was being planned, Jaar began working with authorities. He notified them that on the night of February 20, 2012, a plane carrying cocaine from Venezuela would be landing in south Haiti. Jaar specifically identified "Teleco" as the officer who was coordinating security for this delivery of drugs.

Though he had assisted in planning the shipment, Defendant absented himself from the country on the day of the shipment by visiting family in Florida, but he returned to Haiti the next day, on February 21st. Jaimes-Penuela and Anchico-Candelo met the plane at the landing strip, and the cocaine was unloaded and placed in a vehicle. The cocaine was then taken to the residence that Jaimes-Penuela and Anchico-Candelo had previously rented from Defendant. Defendant later visited the house to discuss the delivery. Jaar kept 50 kilograms and Anchico-Candelo sold 100 kilograms before the cocaine was seized.

On February 23, 2012, authorities searched the residence and a truck on the premises, where they discovered the remaining 270 kilograms of cocaine as well as a drug ledger with the name "Teleco" on it. Among the packages of cocaine seized was a package that was marked with a Yahoo! logo and a smiling face. Defendant was eventually arrested on November 13, 2014, at the United States embassy.

## B. Procedural History

At the time of this incident, 21 U.S.C. § 959(a)(2) (2012) made it unlawful for any person to manufacture or distribute a controlled substance "knowing that such substance . . . will be unlawfully imported into the United States."[2] Section 963 prohibits individuals from conspiring to violate § 959(a). 21 U.S.C. § 963. Defendant was indicted under § 963 for conspiring to violate § 959(a)(2).

Prior to trial, the Government filed a motion *in limine* to admit testimony about drug packages seized in the United States that bore the same Yahoo!/smiling face logo as the drugs seized in Haiti, as well as expert testimony regarding methods of producing and packing cocaine, shipping routes for the transport of illegal drugs, and the significance of markings on cocaine packaging. Defendant challenged this evidence as irrelevant and unfairly prejudicial. The court granted the Government's motion to admit the evidence.

At trial, a DEA chemist, one of the Government's expert witnesses, testified that at least five packages of cocaine seized in a September 2012 raid in Chicago exhibited the same Yahoo!/smiling face logo as the packages seized in Haiti. Another expert witness, DEA Agent Noble Harrison, testified about several matters, including how narcotics are smuggled into the United States and the

---

[2] Section 959(a) was amended in 2016 to prohibit manufacturing or distributing illegal drugs "intending, knowing, or <u>having reasonable cause to believe</u>" that the drugs will be unlawfully imported into the United States. Transnational Drug Trafficking Act of 2015, Pub. L. No. 114-154, § 2, 130 Stat. 387 (2016) (emphasis added).

significance of markings on packages of cocaine. According to Agent Harrison, Haiti is a "transshipment" country and serves as a stopover point as drug traffickers take drugs from the "source" country, where the drugs are made, to the "consumption country," where the drugs are consumed. Agent Harrison noted that drugs passing through Haiti are most likely bound for the United States, a consumption country, especially if the loads are larger. It is rare, though not unheard of, for drugs destined to Europe from South America to pass through Haiti. Agent Harrison further testified that the markings found on cocaine packaging, like the Yahoo!/smiling face logo, act either as a "stamp of quality control," signifying the drug's origin, or show that the drugs are attributable to a particular group or individual who did not produce the drug but purchased it and further distributed it.

At the close of the Government's case, Defendant moved for a judgment of acquittal, arguing that a reasonable person could not find him guilty of conspiring to possess with intent to distribute knowing that the drugs would be imported to the United States. Defense counsel focused on the possibility that the drugs were not actually bound for the United States. The court denied the motion, noting that several witnesses had testified that they conspired with Defendant to bring cocaine from Haiti to the United States. The jury ultimately found Defendant guilty, and the court sentenced him to 192 months' imprisonment and 5 years of supervised

release.  Defendant appeals the denial of his judgment of acquittal and his conviction, arguing primarily that the evidence was insufficient to prove that he knew the cocaine being exported from Haiti was destined for the United States and also arguing that the court erred by permitting Agent Harrison's testimony.

## II. DISCUSSION

### A. Sufficiency of Evidence Concerning Defendant's Knowledge

Defendant argues that the district court erred in denying his motion for acquittal because there was no evidence that Defendant had actual knowledge that the drugs were to be shipped to the United States.  A court's denial of a motion for acquittal based on sufficiency of evidence grounds is reviewed *de novo*, "consider[ing] the evidence in the light most favorable to the Government [and] drawing all reasonable inferences and credibility choices in the Government's favor."  *United States v. Browne*, 505 F.3d 1229, 1253 (11th Cir. 2007).[3] Accordingly, sufficient evidence "requires only that a guilty verdict be reasonable, not inevitable, based on the evidence presented at trial," and if it is, we must affirm.  *Id.*  In short, we look to whether "substantial evidence" supports the verdict.  *United States v. Starrett*, 55 F.3d 1525, 1541 (11th Cir. 1995).

---

[3]  The Government argues that Defendant did not raise precisely enough before the district court the argument that the Government did not introduce sufficient evidence on the element of knowledge, and so this argument should be reviewed under a plain error standard.  We need not resolve this question because even under a *de novo* standard, we conclude that sufficient evidence supports Defendant's conviction.

Admittedly, no witness testified to hearing Defendant say the words, "I know the drugs are heading to the United States," but the knowledge requirement under § 959(a)(2) can be shown through circumstantial evidence. *United States v. Martinez*, 476 F.3d 961, 968 (D.C. Cir. 2007).[4]  The Government points to several pieces of circumstantial evidence that, when viewed cumulatively, provide substantial evidence from which a reasonable jury could conclude that Defendant knew the cocaine he was conspiring to distribute was bound for the United States. *See Martinez*, 476 F.3d at 968–70; *Bollinger*, 796 F.2d at 1405.

Defendant had worked closely with three co-conspirators who testified to their own awareness that the cocaine was going to the United States.  Specifically, Acevedo-Rincon and Anchico-Candelo acknowledged their understanding that the cocaine brought into Haiti, and safeguarded by Defendant, was enroute to the United States.  Jaimes-Penuela testified that he believed the cocaine shipments were bound for the United States, and he had never heard of the shipments going to Europe.  That the people Defendant was working closely with knew the destination of the cocaine is a fact that suggests that Defendant, himself, would likewise be in

---

[4] In the closely analogous situation of prosecutions under 21 U.S.C. § 952, which prohibits knowingly importing controlled substances into the United States, this Court has held that the knowledge requirement can be met through circumstantial evidence. *United States v. Leavitt*, 878 F.2d 1329, 1336–37 (11th Cir. 1989); *United States v. Bollinger*, 796 F.2d 1394, 1405 (11th Cir. 1986); *United States v. Bascaro*, 742 F.2d 1335, 1360 (11th Cir. 1984) *abrogated on other grounds by United States v. Lewis*, 492 F.3d 1219 (11th Cir. 2007).  Indeed, the D.C. Circuit in *Martinez* cited *Bollinger* and *Bascaro* in support of its holding that circumstantial evidence can lead to a conviction under § 959(a)(2). *Martinez*, 476 F.3d at 969–70.

the know on this very important aspect of the conspiracy. *Bollinger*, 796 F.2d at 1405 ("All the people with whom [the defendant] had extensive dealings . . . knew that the cocaine was to be imported into the United States.").

That Defendant played a leading role in the smuggling operation further bolsters an inference that he would be expected to know the destination of the drugs from which he was profiting. Defendant was Jaar's "right-hand man," and, in addition to organizing security at the airstrip to allow the plane to land clandestinely and to be unloaded, he was present at meetings where the shipments were arranged. Further, it was his house that was used by co-conspirators as both a meeting place and as a stash house for the cocaine until it could be sent on its way.

Expert testimony about the role of Haiti in drug importation enterprises corroborated the testimony of the co-conspirators. Specifically, this expert testimony established that the domestic market for cocaine consumption in Haiti is small and that cocaine can fetch up to four times as much in the United States as it can in Haiti. For that reason, Haiti is not the stopping point for a large shipment of cocaine, which instead is intended to be sent to a market where it can command a high price. The United States is such a market, and Haiti is known as a "transshipment" country for drugs bound for the United States from South America. Indeed, the quantity of drugs involved in this conspiracy suggested that the export was heading to a high-demand destination like the United States.

Although the expert could not state dispositively that drugs are never sent to Europe from Haiti, he testified that such shipments were rare.  Furthermore, cash payments in furtherance of the conspiracy were made in American dollars, not in the local Haitian currency nor in Euros, which further suggests that the drugs were being purchased in the United States.

In short, we conclude that the Government produced sufficient evidence to prove that during the seven year period of time from 2005–2012 specified in the indictment, Defendant conspired to import cocaine into the United States.

### B. Admissibility of Agent Harrison's Expert Testimony

Defendant also challenges the district court's admission of Agent Harrison's expert testimony about the significance of the markings on cocaine packaging and the similarity of markings found in Illinois and Haiti.  Specifically, some packages seized in Haiti contained a marking showing a Yahoo! logo and a smiling face.  Similarly, a package containing cocaine and showing the same marking had been found in Illinois during the same 2012 time period.  The agent testified that cocaine packaging that is marked typically reflects a "stamp of quality control" that signifies the product's origin or informs the sellers down the distribution chain of the identity of the group to whom the drugs should be attributed.

We review a district court's evidentiary rulings for an abuse of discretion.  *United States v. Green*, 842 F.3d 1299, 1307 (11th Cir. 2016).  The Federal Rules

of Evidence state, as a threshold matter, that all evidence that is relevant to the case is admissible, unless otherwise provided by law. Fed. R. Evid. 402. Evidence is relevant if it has any tendency to make a fact of consequence more or less probable than it would be without the evidence. Fed. R. Evid. 401. The district court may exclude evidence otherwise admissible if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. Fed. R. Evid. 403. The Supreme Court has instructed that "unfair prejudice" "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997). While a district court has broad discretion to admit probative evidence, its discretion to exclude evidence under Rule 403 is limited. *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990). Rule 403 is an "extraordinary remedy" that should be invoked "sparingly"; balancing should be struck in favor of admissibility, "look[ing] at the evidence in a light most favorable to its admission, maximizing its probative value and minimizing its undue prejudicial impact." *United States v. Tinoco*, 304 F.3d 1088, 1120 (11th Cir. 2002) (quoting *United States v. Elkins*, 885 F.2d 775, 784 (11th Cir. 1989)).

Defendant argues that Agent Harrison's testimony about the markings was irrelevant and should not have been admitted under Rule 401. He notes that the

mere discovery of a Yahoo!-labeled package of cocaine in Illinois, without more, does not necessarily mean that the cocaine originated from Defendant's smuggling organization nor, even if it did, that Defendant's group had not necessarily sent drugs marked with the same labeling to Europe or a place other than the United States. Accordingly, Defendant argues, Agent Harrison's testimony was not relevant to show that the seized shipment was bound for the United States, or that Defendant knew that any shipments were bound for the United States.

It is true that the contested evidence does not definitively establish either of the above two points and, in fact, the expert witness acknowledged the same on cross-examination. Yet, that the probative value of the evidence was low does not mean that it fails the low threshold set out in Rule 401: evidence is relevant if it has any tendency to make a fact of consequence more or less probable that it would be without the evidence. That during the same time period in Illinois, cocaine packaging had been found with the exact same type of marking as the cocaine packages seized at Defendant's house is a fact that tends to make it more probable that the intended site of Defendant's intended importation might also have been the United States.

Even if this evidence was relevant under Rule 401, Defendant argues that its probative value was substantially outweighed by the danger of unfair prejudice, which he says made it inadmissible under Rule 403. Defendant argues that the

testimony asked the jury to draw the unsupported inference that the cocaine seized in Illinois and Haiti came from a common producer or distributor that shipped exclusively to the United States.  Yet, Agent Harrison's testimony did not demand this inference, as the agent testified that he did not know whether the Yahoo!/smiling face logo was connected to any particular producer or distributor, nor could he say definitively whether that logo had ever been found in Europe. Likewise, Agent Harrison never attempted to opine as to Defendant's personal knowledge.

Notably, Defendant does not challenge on appeal the admission of the logo evidence itself.  It was this evidence on which a jury could more likely draw the inference that Defendant opposes, not the agent's rather unremarkable observation that a marking can serve as the brand of the group which has distributed the drugs. Given that Agent Harrison's expert testimony was relevant and it did not unfairly prejudice Defendant, we conclude the district court did not abuse its discretion in admitting it.

### III. CONCLUSION

The district court did not abuse its discretion in admitting the challenged evidence and sufficient evidence exists to support Defendant's conviction. Accordingly, Defendant's conviction is **AFFIRMED**.

## UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 20, 2017

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 16-10348-AA
Case Style: USA v. Claude Thelemaque
District Court Docket No: 1:14-cr-20503-KMW-1

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the Criminal Justice Act (CJA) must submit a voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for writ of certiorari (whichever is later) via the eVoucher system. Please contact the CJA Team at (404) 335-6167 or cja_evoucher@ca11.uscourts.gov for questions regarding CJA vouchers or the eVoucher system.

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Tonya L. Searcy, AA at (404) 335-6180.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1 Ntc of Issuance of Opinion